FILED
2020 Mar-13 PM 02:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| BEVERLY LANGFORD, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No.: 2:19-cv-00953-JHE ) |
| DARRYL L. RICHARDSON, NORTHPOINTE BANK, INC., AND ROYCE DARRELL SHARP, | ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION[1]

Defendants Northpointe Bank, Inc. ("Northpointe") and Royce Darrell Sharp ("Sharp") removed this action from the Circuit Court of Jefferson County, Alabama on June 20, 2019. (Doc. 1). On July 22, 2019, Plaintiff Beverly Langford ("Langford") moved to remand, arguing Northpointe and Sharp's removal was inappropriate because the court does not have federal question jurisdiction over Langford's claims. (Doc. 6 at 2-3).[2] Langford requested the court to order Northpointe and Sharp to pay Langford's costs, actual expenses, and attorney's fees incurred as a result of the removal. (*Id.* at 4). Northpointe and Sharp responded, arguing that Langford's case invokes federal question jurisdiction because, although the case only involves state-law causes of action, Langford's right to relief under state law requires resolution of substantial questions of federal law. (Doc. 12). Northpointe and Sharp also oppose Langford's request for

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 14).

[2] 28 U.S.C. § 1447(c) provides "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."

costs and fees. (Doc. 12 at 8). Langford did not file a reply brief. The motion to remand is now ripe for review. For the reasons stated below, the motion to remand is **GRANTED**, and the request for costs, actual expenses, and attorney's fees is **DENIED**.

## I. Standard of Review

Federal courts are courts of limited jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994). Accordingly, this Court is "'empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution.'" *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409 (11th Cir. 1999) (quoting *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994)). "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (internal citations omitted). When the parties disagree on the court's jurisdiction, questions or doubts are to be resolved in favor of returning the matter to state court on a properly submitted motion to remand. *Burns*, 31 F.3d at 1095. Construction of removal statutes are based on federal law. *Grubbs v. Gen. Elec. Credit Corp.*, 405 U.S. 699, 705 (1972). "Whether a claim arises under federal law for purposes of 28 U.S.C. § 1331 is generally determined by the well-pleaded complaint rule, 'which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.'" *Smith v. GTE Corp.*, 236 F.3d 1292, 1310 (11th Cir. 2001) (quoting *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987)).

## II. Background and Procedural History

On May 16, 2019, Langford filed this action in the Circuit Court of Jefferson County, Alabama against Northpointe, Sharp, and Darryl Richardson. (Doc. 1-1). Langford asserts seven state-law claims in her Complaint: (i) negligence and/or wantonness; (ii) breach of contract; (iii) fraudulent misrepresentation/fraud in the inducement; (iv) fraud; (v) slander to credit; (vi)

2

negligent and/or wanton training, supervision, and retention; and (vii) intentional infliction of emotional distress ("IIED"). (*Id.* at 6-14).

Langford alleged that Northpointe employed Sharp as a branch manager and senior loan officer, and Sharp subsequently hired Richardson. (*Id.* at 3). Richardson has a history of engaging in fraudulent financial transactions, and, as a result, the State of Alabama denied Richardson a license to sell or originate mortgages in the state. (*Id.* at 3-4). Northpointe did not have its own license to sell or originate mortgages in the state. (*Id.*). Nevertheless, Northpointe employed Richardson as a mortgage banker/loan officer and offered services such as selling or brokering mortgages in Alabama. (*Id.*).

Langford required a mortgage for an investment property, and she consulted with Richardson about obtaining a mortgage. (*Id.*). Richardson, Northpointe, and Sharp did not disclose to Langford any required fees to apply for or originate a loan. (*Id.*). Richardson informed Langford that he would need to obtain a copy of her credit report to determine if she qualified for a mortgage. (*Id.* at 5). Richardson then told Langford that she would need to provide a $500 money order payable to him personally before he could submit her mortgage application. (*Id.* at 5). Langford provided Richardson with a money order for $500 payable to "Darryl Richardson." (*Id.* at 19). Richardson endorsed the check as "Beverly Langford," but Richardson's birth date and driver's license were noted on the check because the bank paid the check's proceeds to him. (*Id.* at 5, 19). After Langford failed to qualify for a mortgage at Northpointe, Richardson forwarded her information to other lenders to obtain quotes for a mortgage loan. (*Id.* at 6). Langford directed Richardson to cease his inquiries which were damaging her credit score. (*Id.*). Nevertheless, Richardson continued to access Langford's credit report, and he used Langford's

identity to create a Hotmail email account to communicate with lenders while falsely representing himself as Langford. (*Id.*). Northpointe and Sharp subsequently terminated Richardson. (*Id.*).

On May 16, 2019, Langford filed her seven-count Complaint in state court based on this conduct. (*Id.* at 6-14). In four of those claims, Langford made allegations regarding violations of federal laws and regulations. (*Id.*). In her first count, asserting negligence and/or wantonness, Langford alleged that, among other conduct, Richardson, on behalf of Northpointe:

> consciously and callously disregarding state and federal banking laws including but not limited to Alabama's SAFE Act §5-26-1; §5-26-17(1)-(6); *The Truth In Lending Act* [("TILA")], 12 CFR Part 226, Regulation Z; 12 CFR Part 227.2; *Home Ownership and Equity Protection Act* 15 U.S.C. §1601-02, §§1639-41[,] *Real Estate Settlement Procedures Act (RESPA)* 12 U.S.C. §2601-2617, Title X of the *Dodd Frank Wall Street Reform and Consumer Protection Act*, and the regulations promulgated by the *U.S. Consumer Protection Bureau* ("*CFPB*").

(*Id.* at 7). In her second count asserting a breach of contract, Langford alleged that Defendants did not disclose any fees, and that Richardson demanded an advance fee or commission without having obtained a mortgage or loan in violation of the same state and federal banking laws. (*Id.* at 8-9). In her fourth count, Langford alleges fraud based on Richardson's demand that Langford provide Richardson with an advance fee or commission without obtaining a mortgage loan in violation of the same state and federal banking laws. (*Id.* at 10). Langford alleges that Defendants knew or should have known that Richardson's statement was false and that his demand for a payment violated state law and was fraud. (*Id.*). In her seventh count, Langford alleges an IIED claim asserting that "[t]he unlicensed Defendants operat[ed] in violation of federal laws and Alabama's laws extorted money from [Langford] without her obtaining a loan or mortgage" and that such conduct was "intentional and designed to cause emotional distress . . . ." (*Id.* at 14).

On Jun 20, 2019, Northpointe and Sharp removed the case from state court to this court pursuant to 28 U.S.C. §§ 1331 and 1441. (Doc. 1). Northpointe and Sharp explained that

Langford's state law claims "rel[y] upon and raise[] significant issues of federal law." (*Id.* at 1). Northpointe and Sharp contend that in her first, second, fourth, and seventh claims Langford asks the court to determine whether Defendants' conduct violated federal laws including the TILA, RESPA, and the CFPB regulations. (*Id.* at 5-7). They contend that these "pure issues of federal law" are "best decided by a federal court" and that Langford's claims "implicate important federal issues." (*Id.* at 6-7). Langford promptly filed her motion to remand this action back to state court. (Doc. 6). In her remand motion, Langford emphasized that none of her state-law claims raised a federal issue and that her "reference to alleged violations of federal law are part of the factual background . . . ." (*Id.* at 3). Langford also requested that the court order Northpointe and Sharp to pay Langford the costs, actual expenses, and attorney's fees that she incurred due to their removal of this action. (*Id.* at 4).

### III. Analysis

#### A. Motion to Remand

In the Notice of Removal, Northpointe and Sharp assert that this court has federal question jurisdiction over this action because "[Langford's] Complaint facially asserts substantial and important issues of federal law . . . ." (Doc. 1 at 4-7). As discussed above, they specifically point to Counts I (negligence/wantonness), II (breach of contract), IV (fraud), and VII (intentional infliction of emotional distress). (*Id.* at 5-7).

District courts possess "original jurisdiction of all civil actions arising under" federal law. 28 U.S.C. § 1331. A case arises under federal law in two ways. *Gunn v. Minton*, 568 U.S. 251, 257 (2013). First, "a case arises under federal law when federal law creates the cause of action asserted." *Id.* Second, "where a claim finds its origins in state rather than federal law . . . [the Supreme Court has] identified a 'special and small category' of cases in which arising under jurisdiction still lies." *Id.* at 258. "[F]ederal jurisdiction over a state law claim will lie if a federal

5

issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* The court determines whether a particular federal-law issue is substantial by looking at "the importance of the issue to the federal system as a whole." *Id.* at 260.

The analysis of the parties' jurisdiction arguments is informed by three cases in which the Supreme Court articulated the contours of substantial federal question jurisdiction. First, in *Grable & Sons Metal Prods, Inc. v. Darue Eng'g & Manf.*, 545 U.S. 308 (2005), the Supreme Court analyzed whether federal question jurisdiction exists over a quiet title action for land obtained at a federal tax sale. The Court held that the action raised necessary and disputed federal law question because the petitioner's only basis for challenging the tax sale was the IRS's failure to give it adequate notice of the sale. *Id.* at 315. The Court then determined that the case presented a substantial issue that warranted review in federal court because of (i) the government's interest in collecting taxes and obtaining funds from seized property, (ii) the government's interest in a federal forum to address administrative actions, and (iii) the buyers' interest in a forum acquainted with federal tax matters to evaluate the IRS's actions. *Id.* In conclusion, the Court determined that the exercise of federal question jurisdiction would not disrupt the federal-state balance because "it will be the rare state title case that raises a contested matter of federal law . . . ." *Id.*

Next, in *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 682-83 (2006), the Supreme Court considered whether a federal court has jurisdiction over a state-law reimbursement claim brought by an insurance carrier insuring a federal employee under the Federal Employees Health Benefits Act. The Court rejected the insurance carrier's argument that "federal law is a necessary element of the carrier's claim for relief." *Id.* at 699-701 (internal quotation marks and alterations omitted). The Supreme Court distinguished the reimbursement

6

claim from the quiet title claim in *Grable* because the dispute in *Grable* "centered on" the IRS's action, but the dispute in *Empire Healthchoice* "was triggered" by a private settlement arising out of a state-law personal-injury action. *Id.* at 700. In addition, the Court stated *Grable* "presented a nearly 'pure issue of law,'" but the reimbursement claim "is fact-bound and situation-specific." *Id.* at 700-701. The Court concluded that the *Empire Healthchoice* case "cannot be squeezed into the slim category *Grable* exemplifies." *Id.* at 701.

Finally, in *Gunn*, the Supreme Court analyzed whether a statute granting federal courts exclusive jurisdiction over cases "arising under any Act of Congress relating to patents" applies to a state-law legal malpractice claim related to the handling of a patent case. 568 U.S. at 253. The Court explained that such cases "may necessarily raise disputed questions of patent law" and that the case before the court presented a necessary and disputed question of federal patent law. *Id.* at 258-260. Regardless, the malpractice claim did not raise a "substantial" federal issue upon consideration of the "importance of the issue to the federal system as a whole." *Id.* at 260. The court determined that legal malpractice claims do not significantly affect the federal system because: (i) such actions will not affect the result of prior patent litigation, (ii) "federal courts are . . . not bound by state court" rulings on such cases, and (iii) federal courts will at some point decide the novel patent law questions that arise for the first time in the patent-related malpractice suits. *Id.* at 261-62. Responding to the argument that the state-court malpractice action might result in patent law issue preclusion, the Court stated "the result would be limited to the parties and patents that had been before the state court" which "are not sufficient to establish [substantial federal question] jurisdiction." *Id.* at 1067-68.

The Eleventh Circuit's opinion in *Adventure Outdoors v. Bloomberg*, 552 F.3d 1290 (11th Cir. 2008), is also informative. In *Adventure Outdoors*, the Eleventh Circuit examined whether

substantial federal question jurisdiction applied to a state-law action asserting negligence and defamation claims arising from a simulated straw purchase of a firearm. *Id.* at 1293-94. The removing defendants argued that the state-law claims implicated the legality of the simulated straw purchase under federal law. *Id.* at 1297-98. With respect to the negligence claims, the Eleventh Circuit concluded that the existence of a legal duty and whether the defendants breached the duty could be resolved without applying federal law. *Id.* at 1297. In addition, any harm to the plaintiffs' business could be determined without resolving an issue of federal law regarding straw purchases because the alleged harm arose from defendants' alleged failure to conduct a "careful and thorough investigation . . . ." *Id.* As to the defamation claims, which focused on defendants' statements that plaintiffs violated federal law, the Eleventh Circuit found that the claims necessarily raised a federal issue which the parties disputed. *Id.* at 1298-99. Nevertheless, the court held that the defamation claims failed to present a "substantial" federal question. *Id.* at 1299. The Eleventh Circuit distinguished nearly pure questions of federal law, for which federal-court jurisdiction is more appropriate, from "fact-specific applications" of federal and state law. *Id.* The court noted that the relevant law's meaning was clear. *Id.* at 1300. In addition, the state court's application of federal criminal law would not disturb the law's uniformity and consistency because federal courts "would not be bound by the state court interpretation . . . ." *Id.* at 1300-01 (internal alterations omitted). As a result, the court determined that remanding the case was "unlikely to impact the federal government's interests . . . ." *Id.* at 1301. The Eleventh Circuit also noted that resolution of the case in the state system would not disrupt the federal-state balance because state court interpretations of federal statutes would not have any precedential effect in the federal systems, whereas the application of federal jurisdiction "would open the doors of federal courts in the circuit whenever a defamation defendant accuses a plaintiff of violating federal law." *Id.* at 1301-02.

With that background, the undersigned turns to Langford's complaint. In her motion to remand, Langford states that "[n]one of [her] claims raise 'a stated federal issue'" because she asserts state law claims and references to violation of federal law "are part of the factual background . . . ." (Doc. 6 at 3). Northpointe and Sharp respond that Langford affirmatively asserted violations of federal statutes and her argument is belied by her "Requests for Admissions . . . which specifically ask [Northpointe and Sharp] to admit violations of the specific federal statutes." (Doc. 12 at 4). Because the court only considers the face of the complaint to determine if a claim arises under federal law, *Smith*, 236 F.3d at 1310, Northpointe and Sharp's argument premised on Langford's discovery requests is misplaced. Thus, the undersigned considers below whether substantial federal question jurisdiction arises out the four counts identified above, without reference to Langford's discovery responses.

**1. Negligence and/or Wantonness**

The undersigned first considers whether Northpointe and Sharp have shown that a federal issue arises out of Langford's negligence and/or wantonness claim. A federal issue is necessarily raised if a court must apply federal law to the facts of Langford's case to prevail on her claim. *See Gunn*, 568 U.S. at 259 (finding that plaintiff had necessarily raised a federal issue where it was necessary to apply federal patent law to the facts of plaintiff's case.); *see Grable*, 545 U.S. at 315 (holding that the exercise of federal jurisdiction was appropriate and stating that "[w]hether [the plaintiff] was given notice within the meaning of the federal statute is thus an essential element of its quiet title claim . . . .").

> To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury. *Albert v. Hsu*, 602 So. 2d 895, 897 (Ala. 1992). To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty. To be actionable, that act or omission must proximately cause

9

the injury of which the plaintiff complains. *Smith v. Davis*, 599 So.2d 586 (Ala. 1992).

*Williams v. Fann*, Nos. 2170988 & 2170989, 2019 WL 167213, at *3 (Ala. Civ. App. Jan. 11, 2019) (internal quotation marks omitted) (quoting *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994). Among other things, Langford identifies federal law as the source of the legal duty for her claim. (*See* doc. 1-1 at 7). But this does not necessarily raise a federal issue, since Langford also includes a violation of Alabama's SAFE Act,[3] (*see id.*), that a court could conceivably hold supports a negligence claim irrespective of whether Defendants violated federal law. *Cf. Adventure Outdoors*, 552 F.3d at 1298 (finding that plaintiffs' negligence claim did not necessarily raise an issue of federal law where complaint did not identify the source of the legal duty and a determination of whether defendants breached any duty could be "resolved without applying federal law.").

That said, any federal issues arising out of Langford's claim are not actually disputed. An actual dispute is one that "really and substantially involve[es] a dispute or controversy respecting

---

[3] The Alabama SAFE Act, ALA. CODE § 5-26-1 *et seq.*, governs some acts and practices related to mortgage transactions. Langford's complaint points to § 5-26-17(1)-(6), forbidding an individual subject to the SAFE Act to:

(1) Obtain property by intentional fraud or intentional misrepresentation;
(2) Solicit or enter into a contract with a borrower that provides in substance that the person or individual subject to this chapter may earn a fee or commission through "best efforts" to obtain a loan even though no loan is actually obtained for the borrower;
(3) Conduct any business covered by this chapter without holding a valid license if required under this chapter;
(4) Fail to make disclosures as required by this chapter;
(5) Fail to comply with this chapter or rules or regulations promulgated under this chapter; [or]
(6) Collect, charge, or attempt to collect or charge any fee prohibited by this chapter[.]

10

the validity, construction or effect of federal law." *Grable*, 545 U.S. at 313 (internal quotation marks and alterations omitted) (quoting *Shulthis v. McDougal*, 225 U.S. 561, 569 (1912)). Northpointe and Sharp have not established the second factor because they do not specify a real dispute over the validity, construction, or effect of any specific federal law. (*See* doc. 12 at 4). Rather, Northpointe and Sharp argue that there is a dispute over compliance with or a violation of federal law. (Doc. 12 at 4-5).

Citing *Barone v. Bausch & Lomb, Inc.*, 372 F. Supp. 3d 141, 148-49 (W.D.N.Y. 2019), Northpointe and Sharp argue a dispute exists when "parties disagree over whether there has been compliance with a federal law or a violation of the law." (Doc. at 4-5). In *Barone*, the district court considered whether substantial federal question jurisdiction existed over an action asserting various common law causes of action arising out of the alleged malfunction of a surgically implanted device. 372 F. Supp. 3d at 144, 147-159. Examining whether the parties actually disputed the federal issue, the court noted a split of opinion between the Courts of Appeals for the Third and Second Circuits. *Id.* at 148-49. For a federal issue to be considered "actually disputed," the Third Circuit requires "that the parties must disagree over the interpretation of a statue or a regulation . . ." but the Second Circuit only requires that "the parties disagree over whether there has been compliance with or violation of federal law . . . ." *Id.* at 148. The trial court followed controlling Second Circuit precedent and determined that because the parties disputed whether a violation of law took place the second requirement was satisfied. *Id.* at 149. But *Barone* is inconsistent with controlling Supreme Court and Eleventh Circuit decisions. *See Grable*, 545 U.S. at 313 (stating that an actual dispute is one that "really and substantially involve[es] a dispute or controversy respecting the validity, construction or effect of federal law." (internal quotation marks and alterations omitted) (quoting *Shulthis*, 225 U.S. at 569)); *Adventure Outdoors*, 552 F.3d

at 1300 (holding that an actual dispute did not exist where the parties disputed the facts but the parties' argument "[did] not amount to an argument about the meaning of federal law.").

Northpointe and Sharp have also failed to establish that any federal issue is substantial. Northpointe and Sharp argue that "the statues that [Langford] relies upon, specifically invoke . . . conduct in which the government has demonstrated a strong interest." (Doc. 12 at 6-7). Northpointe and Sharp assert in a conclusory manner that the existence of a federal law equates to a "strong interest." Their argument makes the substantiality analysis meaningless after a court finds the existence of a federal issue. In fact, the Eleventh Circuit has found, in similar circumstances, that "[t]he federal government has a limited interest in [a] private tort action over private duties tangentially related to the federal . . . laws . . . ." *Adventure Outdoors*, 552 F.3d at 1301 (discussing federal gun laws). This is especially so, where, as here, "the federal government may continue to enforce federal . . . laws and regulations without concern for the outcome of this lawsuit." *Id.* (discussing federal gun laws).

Northpointe and Sharp assert that a federal court decision addressing these federal statutes and rules relating to mortgage loans will "promote uniformity." (*Id.* at 7). In *Adventure Outdoors*, the Eleventh Circuit's addressed a uniformity argument in the context of federal criminal law:

> The federal government unquestionably has a strong interest in the uniformity and consistency of federal criminal law. However, state court application of federal criminal law in the civil context does not pose a serious threat to this federal interest. If the state court were to exercise jurisdiction here, the federal courts still "would retain full authority and responsibility for the interpretation and application of federal criminal law, for they would not be bound by the state court interpretation" of the federal gun statutes. In resolving the federal issue, the state court would "be guided by federal court interpretations of the relevant federal criminal statutes."

552 F.3d at 1300-301 (internal citations and alterations omitted). Although the conduct in this case does not involve federal criminal law, the underlying principle applies just as easily to the statutes and regulations at issue here. Northpointe and Sharp also argue that federal jurisdiction

12

will "advance federal jurisprudence in this area." (Doc. 12 at 7). In other words, they argue that a federal interest exists because the court may issue a decision addressing the federal issue. To be substantial, a federal issue must bear "significan[ce] to the federal system as a whole," *Gunn*, 568 U.S. at 264, but Northpointe and Sharp do not show any federal interest in the issuance of federal decisions in the mortgage law field, (*see id.*). Moreover, their argument could apply to *any* federal case on *any* federal issue, making the substantiality analysis meaningless. Thus, the court does not find the federal government has an interest—let alone a strong interest—in any federal issues arising out of Langford's claim.

To get around this, Northpointe and Sharp cite *New York City Health and Hospitals Corp. v. WellCare of New York, Inc.*, 769 F. Supp. 2d 250 (S.D.N.Y. 2011), for the proposition that the federal government has a particular interest in uniformity and advancement of federal jurisprudence where an "intricate federal regulatory scheme" exists such as the CFPB's consumer credit transaction regulatory regime. (Doc. 12 at 7). Northpointe and Sharp's reliance on *New York City Health* is misplaced because it is a non-binding authority that is factually inapplicable to this case. In *New York City Health*, the court considered whether substantial federal question jurisdiction applied to an action asserting breach-of-contract and unjust enrichment claims in the context of a dispute between a health care provider and a managed health care organization over payments regulated by the federal Medicare program. 769 F. Supp. 2d at 252-54. That court determined that the plaintiff's breach-of-contract claim raised a federal issue because the contract "incorporate[d] Medicare law and regulations" which required an interpretation of federal law regardless of the case's removal to federal court. *Id.* at 256-57. The court also found the federal issue to be actually disputed and substantial. *Id.* at 256-58. The court then found that Congress had established an administrative review process with multiple levels of review expressing the

congressionally approved balance between federal and state responsibilities. *Id.* at 258. The court observed that "the absence of an administrative review process is not dispositive" for finding that an action belongs in state court. *Id.* The court concluded that the complex federal regulatory scheme required the exercise of substantial federal question jurisdiction to ensure uniformity. *Id.* at 259.[4] Unlike *New York City Health*, Northpointe and Sharp have not shown that the contract that Langford seeks to enforce incorporated federal law or regulations, that a federal law or regulation is at issue requiring interpretation, or that Defendants' conduct was governed by a regulatory regime similarly complex to the Medicare payment system. The reasoning in *New York City Health* is inapposite, and Northpointe and Sharp have failed to show the federal government's interest in the outcome of this case.

The single factor on which Northpointe and Sharp nudge a bit closer towards jurisdiction is the fourth jurisdictional requirement: that the federal issue is "capable of resolution in federal court without disrupting the federal-state balance approved by Congress," *Gunn*, 566 U.S. at 258. The Eleventh Circuit explained that Congress's provision of a private right of action "is evidence

---

[4] Northpointe and Sharp do not address portions of *New York City Health* that do not support their position. In *New York City Health*, the court stated:

> The cases on which [the plaintiff] relies for the proposition that the federal issues here are not substantial are inapposite. . . . In *Greenwich Financial Services Distressed Mortgage Fund 3, LLC v. Countrywide Financial Corp.*, the defendants removed a breach of contract action to federal court under *Grable* by invoking [TILA]. In granting the motion to remand to state court, the court found that . . . the federal statute was not incorporated by reference into the contracts, and had the defendants not raised TILA as an issue in the case, plaintiffs would not have required an interpretation of federal law in order to succeed on their claims.

769 F. Supp. 2d at 257 (internal citations omitted). Because Northpointe and Sharp have not shown that TILA or any other statute was incorporated in the contract at issue in this case and Langford's breach of contract claim does not otherwise require an interpretation of federal law, *New York City Health* supports the proposition that Northpointe and Sharp would be unable to demonstrate the third jurisdictional factor in connection with Langford's breach of contract claim.

that the congressionally mandated jurisdictional balance between federal and state courts supported a finding of jurisdiction . . . ." *Adventure Outdoors*, 552 F.3d at 1303. Northpointe and Sharp point out that "[p]rivate rights of action exist for violation of [TILA] and Regulation Z—15 U.S.C. § 1640—exhibiting a Congressional motivation to regulate certain mortgage originator conduct." (Doc. 12 at 7). Accordingly, this matter could conceivably be resolved in federal court. But just because it is *capable* of resolution in federal court does not mean that it *ought* to be resolved in federal court. Although Northpointe and Sharp assert that exercising jurisdiction over this action will not cause state court defendants to remove state court actions to federal court "because the number of complaints . . . which affirmatively assert violations of federal statutes *within* their state court cases of action should be relatively small," (doc. 12 at 7), this is supposition. Moreover, Northpointe and Sharp have not shown Congress established exclusive federal jurisdiction over mortgages and intended to bar state courts from considering tort or breach of contract claims that required resolution of a hypothetical mortgage law issue. *See Gunn*, 568 U.S. at 264 (finding no reason to suppose that Congress, in establishing exclusive federal jurisdiction over patent case, meant to bar state courts from considering legal malpractice claims that required resolution of a hypothetical patent issue.); *Empire Health Care*, 547 U.S. at 701 (stating that federal interests in attracting workers to the federal workforce and in the health and welfare of federal workers did not warrant turning an insurer's contract-derived claim for reimbursement into a federal case.); *Adventure Outdoors*, 552 F.3d at 1303 ("[T]he balance of state and federal jurisdictional responsibilities most consistent with clearly expressed congressional intent is state court resolution of state tort claims . . . ."). Thus, Northpointe and Sharp have not met their burden of demonstrating the fourth factor.

For the reasons set forth above, Northpointe and Sharp have failed to show that the federal issues in Langford's first claim are actually disputed, substantial, or "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *See Gunn*, 568 U.S. at 258. Thus, they have not shown a substantial federal question as to Langford's negligence and/or wantonness claim.

### 2. Breach of Contract

Under Alabama law, to establish a breach of contract claim, Langford must prove: "(1) the existence of a valid contract binding the parties in the action, (2) [Langford's] own performance under the contract, (3) [Defendants'] nonperformance, and (4) damages." *Target Media Partners Operating Co., LLC v. Specialty Mktg. Corp.*, 177 So. 3d 843, 857-58 (Ala. 2013) (internal quotation marks omitted) (quoting *Employees' Benefit Ass'n v. Grissett*, 732 So. 2d 968, 975 (Ala. 1998)). Seemingly, Langford's argument that Northpointe and Sharp violated federal laws relates to their nonperformance of the contract. Northpointe and Sharp argue that Langford's "breach of contract claim[] will necessarily require application of various federal laws to the facts of [Langford's] case." (Doc. 12 at 3). Northpointe and Sharp cite *MDS (Canada) Inc. v. Rad Source Tech., Inc.*, 720 F.3d 833, 841-42 (11th Cir. 2013), for the proposition that a federal issue necessarily arises out of a state law claim where plaintiff must prove a violation of federal law to succeed on a state-law breach of contract claim. (Doc. 12 at 3). Northpointe and Sharp's argument is unconvincing because, as with her negligence claim, Langford also relies on a violation of Alabama state law (again, Alabama's SAFE Act) to support her breach of contract claim. (*See* doc. 12 at 3). In other words, Northpointe and Sharp have not shown that Langford must prove a federal law violation to succeed on her state-law claim. Thus, Northpointe and Sharp have failed to show that a federal issue necessarily arises out of Langford's breach of contract claim. And, for the same reasons discussed above, the other factors are not met either.

**3. Fraud**

Under Alabama law, "[t]he elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation." *Exxon Mobil Corp. v. Alabama Dept. of Conservation and Nat'l Resources*, 986 So. 2d 1093, 1114 (Ala. 2007) (internal quotation marks omitted) (quoting *Saia Food Distribs. & Club, Inc. v. SecurityLink from Ameritech, Inc.*, 902 So.2d 46, 57 (Ala. 2004)). Northpointe and Sharp argue that Langford's fraud claim "will necessarily require the application of various federal laws . . . ." (Doc. 12 at 3). Langford alleges that Defendants "knew or should have known" that Richardson could not sell her a mortgage loan or originate a loan, and that Richardson's demand for a fee "was against the laws in the *state of Alabama* and constituted fraudulent conduct." (Doc. 1-1 at 10-11) (emphasis added). The allegedly fraudulent conduct is premised on whether Richardson's request for a payment of fees violated Alabama—not federal—laws. (*See* doc. 1-1 at 11). Because Langford's claim may be resolved without application of federal law, a federal issue does not arise from Langford's fourth claim for fraud. The same analysis as to the other three factors continues to apply here as well.

**4. IIED**

To recover for an IIED claim, Langford must demonstrate that the Defendants' conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Ex parte Bole*, 103 So. 3d 40 (Ala. 2012) (internal quotation marks omitted) (quoting *Green Tree Acceptance, Inc. v. Standridge*, 565 So.2d 38, 44 (Ala.1990)); *see McCall ex. rel. McCall v. Household Finance Corp.*, 122 So. 3d 832, 837 (Ala. Civ. Appeals 2013) (recognizing that a claim for outrage is synonymous with a claim for IIED). Northpointe and Sharp do not explain why Langford would need to show a violation of federal law to prove any of the three elements of her claim. (*See* doc. 12 at 2-4).

17

Based on the Complaint's allegations, it is unclear how any defendant's alleged violation of the identified federal laws would establish any element of Langford's claim. Thus, a federal issue does not necessarily arise out of Langford's IIED claim. Even if one did, Northpointe and Sharp have failed to demonstrate any of the other substantial federal question factors with respect to this claim.

Since Northpointe and Sharp have failed to satisfy their burden of showing the existence of substantial federal question jurisdiction with respect to any of Langford's claims, Langford's motion to remand this case to state court is due to be **GRANTED**.

### B. Attorney's Fees, Actual Expenses, and Costs

With the case due to be remanded, the undersigned finally considers Langford's request for costs, actual expenses, and attorney's fees. When a court remands a case due to improper removal, the court may award the plaintiff attorney's fees and costs. *See* 28 U.S.C. § 1447(c). "[T]he standard for awarding fees should turn on the reasonableness of the removal. Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). "In applying this rule, district courts retain discretion to consider whether unusual circumstances warrant a departure from the rule in a given case." *Id.* The reasonableness standard balances "the desire to deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party, while not undermining Congress' basic decision to afford defendants a right to remove as a general matter, when the statutory criteria are satisfied." *Id.* at 140.

Langford's entire argument is a conclusory, one-sentence request for "any just costs, any actual expenses, and attorney's fees incurred as a result of the removal." (Doc. 6 at 4). In opposition Northpointe and Sharp argue that they had "an objectively reasonable basis for seeking

the removal—the substantial-federal question jurisdiction doctrine" and that the removal "was timely and complied with all statutory procedural requirements." (Doc. 12 at 8). Even though Northpointe and Sharp were ultimately unsuccessful, an award of costs, actual expenses, and attorney's fees is only available "where the removing party lacked an objectively reasonable basis for seeking removal." *Martin*, 546 U.S. at 141. In her Complaint, Langford raised federal statutes and regulations in four separate claims (*see* doc. 1-1 at 6-14), and the arguments of Northpointe and Sharp in favor of substantial federal question jurisdiction based on those claims is not so far-fetched that it was objectively unreasonable for them to seek removal. Langford does not argue that Northpointe and Sharp's removal was objectively unreasonable or that any unusual circumstances exist. (*See id.*). Since Northpointe and Sharp had an objectively reasonable basis for filing their notice of removal and no unusual circumstances exist requiring the court to alter the analysis of the rule set forth in *Martin*, Langford's request for costs, actual expenses, and attorney's fees is due to be **DENIED**.

### IV. Conclusion

Based on the foregoing, Langford's motion to remand is **GRANTED** with respect to Langford's request that the case be remanded to the Circuit Court of Jefferson County, Alabama, and Langford's request for costs, expenses, and attorney's fees incurred due to Northpointe and Sharp's removal of the action to this court is **DENIED**. A separate order will be entered.

DONE this 13th day of March, 2020.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE